IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARY COMANS,

Plaintiff,

vs.

DEPARTMENT OF HOMELAND SECURITY, et al,

Defendants.

Civil Action No. 1:25-cv-00624-ACR

March 24, 2026
4:00 p.m.

Washington D.C.

---

TRANSCRIPT OF THE PROCEEDINGS
BEFORE THE HONORABLE ANA C. REYES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: Mark Steven Zaid, Esq.
LAW OFFICES OF MARK S. ZAID, P.C.
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036

For the Defendants: John Bardo, AUSA
DOJ-USAO
601 D Street NW
Washington, DC 20530

Court Reporter: Stacy Johns, RPR, RCR
Official Court Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription

**P R O C E E D I N G S**

DEPUTY CLERK: This is Civil Action 25-624, Mary Comans versus Department of Homeland Security, et al.

Would the parties please identify themselves for the record, beginning with plaintiff's counsel.

MR. ZAID: Good afternoon, Your Honor. And I guess belated happy New Year. I don't think we've been here since then. Might as well.

THE COURT: Belated happy New Year to you, sir.

MR. ZAID: Mark Zaid and Taryn Wilgus Null for the plaintiff, and Mary Comans is also here today.

THE COURT: All right. Hello, ma'am.

MS. COMANS: Hello.

THE COURT: Mr. Bardo, we meet yet again.

MR. BARDO: Yes, Your Honor. Good afternoon. John Bardo for the government.

THE COURT: Okay. So last time we were here I think we discussed -- it was unclear that the information that was disclosed would have been disclosed from a government database, right?

MR. BARDO: Yes.

THE COURT: And now apparently you-all have some information that it did come from a database?

MR. ZAID: So in part. If you remember, you had the parties exchange some more information. More from the

government to give to us, which Mr. Bardo cooperated.

THE COURT: Right.

MR. ZAID: And there was information that was revealed with respect to at least the termination was in the system of records before the comments were made by the defendant.

THE COURT: Okay.

MR. ZAID: We did not yet identify that some of the substance surrounding the comments were in the system of record, but we still believe -- because we do not know how the information got to, for example, the DHS spokesperson, who provided the information? Where did they get the information?

We don't have that piece of it, which is what we had suggested in the last status report for limited discovery or even to suggest a sworn declaration we had offered to get from the office of public affairs.

THE COURT: Pretend I've had a lot of other cases since we last met last year and that I don't remember the particulars. So remind me again what was in the press and what came from DHS.

MR. ZAID: Sure. So this was one of the earliest of the Article II firings. Ms. Comans was the CFO over at FEMA. I'm going to have the paraphrase; I don't have the language specifically in front of me. But the DHS spokesperson by name, in several publications, to include *The New York Times*, as I recall, had said that Ms. Comans was part of the Deep State.

And you can imagine anything else that goes along with allegations of the Deep State.

THE COURT: I've heard something.

MR. ZAID: Criminal behavior, some comments like that, in conjunction with her notification of being terminated.

THE COURT: Okay.

MR. ZAID: That's what we were tying together for that.

THE COURT: This is a Records Act violation case?

MR. ZAID: I'm sorry.

THE COURT: This was a Records Act violation case?

MR. ZAID: Privacy Act. I think only Privacy Act, as I recall.

THE COURT: Right.

MR. ZAID: I want to say four counts.

THE COURT: But that requires that the information come from a government record, right?

MR. ZAID: From the system, yes.

THE COURT: Okay. And I assume the allegations that she was part of the Deep State, blah, blah, blah, blah, are untrue; that didn't come from anywhere.

MR. ZAID: We don't know. What I can tell you is that the termination was certainly in the system of record. I think that's very clear just on its face. I would imagine the government would, I think, concede that that's the case.

THE COURT: That's not --

MR. ZAID: It's in the record.

THE COURT: That's not something that's going to be kept private, that she's terminated.

MR. ZAID: We would say so.

THE COURT: All right. Okay.

MR. ZAID: Now, she could say it and there might be some information with respect -- I'm trying to think. I don't think I know of a case where the mere fact -- and I've had some of these in the last year and a half too.

THE COURT: I imagine you have.

MR. ZAID: Yeah. No decisions where the fact of the termination -- because, I mean, the reality is we never saw this before, right, in prior administrations. They wouldn't do press releases. They wouldn't do public statements that would tie into the terminations as if this was a victory.

THE COURT: I doubt it's never happened before. It might be different in quantity, but I'm confident that this has happened before. I mean, there was a famous -- just off the top of my head, Saturday Night Massacre was very, very public, who was getting fired or resigning, or whatever at the Attorney General's -- no, fired, I think, at the Attorney General's Office.

MR. ZAID: I can think back. I've certainly brought either Privacy Act cases or Fifth Amendment liberty interest

cases surrounding terminations, but we never saw it in this type of scenario or environment circumstances.

THE COURT: So now you know that somewhere in a database it says that she was terminated?

MR. ZAID: Correct.

THE COURT: And the question is whether that ties to whoever tweeted out whatever about her?

MR. ZAID: In part, yes.

THE COURT: And what's the rest?

MR. ZAID: So where would the information that -- I think it's a simple question. Where did the Office of Public Affairs and those spokespersons get the information from when they issued their statements?

THE COURT: Okay. What if I just say -- what if I just, you know, down at lunch and someone says, hey, guess what, Mr. Smith was fired. And then I go out and I say Mr. Smith was fired on a tweet, and I'm the DHS spokesperson. That can't possibly be a Privacy Act violation.

MR. ZAID: It would be a good question because you would have to trace it back as to where the information ultimately came from. I had a case recently with the Treasury Department, IRS, where actually the information -- no decision and the case was dismissed for other grounds -- I mean, no substantive grounds. We resolved it. That the wrong information was disseminated out of a Privacy Act system, and

that were the allegations --

THE COURT: I'm sorry. You're telling me if I'm a government employee and I go into a database and I see that Mr. Smith has been fired. He came to Washington. He's getting sent away from Washington. Mr. Smith has been fired. And I go out and I tweet about it, that that's a Privacy Act violation?

It can't be. Everyone's going to know he's fired because he's no longer there. She's going to tell a bunch of people. It just seems very odd to me.

MR. ZAID: Well, there has to be more, right? There has to be willful and intentional.

THE COURT: Well, I willfully go and tell people that she's -- that Mr. Smith has been fired.

MR. ZAID: I think -- it's hard to use a vanilla hypothetical scenario because this was anything but vanilla surrounding what the information was. It was very malicious.

THE COURT: I understand that. But that malicious information wasn't in -- my understanding is that the malicious information was just that, slander, right? A type of slander or libel or whatever we call it, right.

MR. ZAID: Right. But what we don't know and what we never were able to gain a sense of, as I recall, is does the Office of Public Affairs use a system of records to compile its information? Is that information in a system?

THE COURT: Right, right. I understand. But my

understanding is that you're saying that this tweet came out. And the only thing that was accurate and truthful about the tweet was that she was fired.

MR. ZAID: Yes. I'm not sure if it was a tweet per se. Statements, but yes.

THE COURT: A statement, whatever. But the actual true part that one would have gotten from a database was that she was fired?

MR. ZAID: Right.

THE COURT: For the Privacy Act violation, that's the only thing we care about, right?

MR. ZAID: That would be the first thing that we would care about.

THE COURT: What else would we care about?

MR. ZAID: If there was other information, that if it was in the system. We haven't identified that it is.

THE COURT: That's where you and I are missing each other. If the only thing that was in the system was she's fired and they took that, that's one issue, right? You're saying there might have been other information in the system, right?

MR. ZAID: Correct.

THE COURT: I'm saying -- and I think you've just agreed -- that everything that was said publicly, except that she was fired, was a lie.

MR. ZAID: Yes.

THE COURT: Okay. So then if there was other information in the system, what does that matter? If the system also said Mr. Smith likes tuna salad for lunch, it doesn't matter if it's in there. None of it was said.

MR. ZAID: Well, I think at the first point we would say that there is a possibility of a Privacy Act violation, simply by saying publicly that the individual has been fired.

THE COURT: Right, right, right. Yes. Clearly --

MR. ZAID: Pushing that aside. All right. If I think it is an unknown or undecided argument about whether false information that would be slanderous or defamatory could be part of a Privacy Act violation, the question would be is that information, for example -- let's say -- it would be one thing if the spokesperson said it off the top of her head. Phone rings, *New York Times*, boom. Just rattles things off for talking points.

Or were there talking points created? Are there emails? Are there other documents that could be within their system of record? That was one of the things we --

THE COURT: But if she didn't say it, it doesn't matter.

MR. ZAID: No. But if she did. I'm saying the false information, even. The defamatory information.

THE COURT: But if the information is false then it

would not have come -- you're saying that there could be false information in the record system itself?

MR. ZAID: Correct.

THE COURT: And if you pull false information from the record system itself, then that would be a Privacy Act violation?

MR. ZAID: Correct. Because, remember, there's different provisions for the Privacy Act.

THE COURT: I think we're very much in Alice in Wonderland territory here, but I guess. I don't know.

MR. ZAID: One of the provisions in the Privacy Act is ensuring accuracy in the system. There's a disclosure provision, you can't reveal information without written consent of the individual, but there's also an accuracy --

THE COURT: Is there a private right of action with respect to the accuracy component?

MR. ZAID: Yes.

THE COURT: All right. When then that's --

MR. ZAID: We don't see it as much.

THE COURT: All right. So what else do you want?

MR. ZAID: We would just want limited discovery.

THE COURT: I thought I already ordered that. I don't understand why we're back here.

MR. ZAID: No. We only did a very narrow aspect of production. And the government can correct me; I'm trying to

think off the top of my head. Production of the personnel record, which we received.

THE COURT: Okay. Was there inaccurate information in the personnel record?

MR. ZAID: No. Most of it pre-dated the termination.

THE COURT: Of course.

MR. ZAID: There was just the termination in it.

THE COURT: Right. Okay.

MR. ZAID: We sought additional information regarding how the Public Affairs Office does its business, which we didn't believe we received to our satisfaction.

THE COURT: What did you receive about that?

MR. ZAID: We didn't receive anything about it.

THE COURT: Okay. Mr. Bardo, did you ask just how they found out --

Do we know who issued the statement?

MR. ZAID: We asked. We don't know.

THE COURT: Mr. Bardo, do you know?

MR. BARDO: I do, Your Honor. So this stems from a press release that the agency put out saying that Ms. Comans -- I'm sorry, am I pronouncing it right? Comans had been removed for circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants.

That's not in a system of records. I don't know where that information came from. DHS does not know where that

information came from.

THE COURT: Who's the person who said this?

MR. BARDO: Tricia McLaughlin, the former spokesperson, who, as of a month ago, no longer works at DHS.

THE COURT: Was she the one who said she would see me at the Supreme Court?

LAW CLERK: Yes.

THE COURT: Hold on. Can we go off the record for a moment?

(Discussion off the record)

THE COURT: Okay. Sorry, go ahead. Yes.

MR. BARDO: Yes. So we did, since last time we met with the parties and the Court, I worked with plaintiff's counsel to identify systems of records that they thought might contain the information. We produced all the information regarding Ms. Comans.

THE COURT: So you no longer have access to her, right, the woman who made the statement?

MR. BARDO: Ms. McLaughlin? I mean, she doesn't work for the government anymore. I can't compel her to do anything.

But we would -- we are prepared, though, Your Honor, to argue that saying that -- putting aside whether this question about migrants and luxury hotels is even true, we're prepared to argue that simply stating that someone has been terminated is not in and of itself a violation of a Privacy

Act. Because it's public record whether --

THE COURT: Was it in the records anywhere -- putting aside whether it was appropriate or inappropriate. I'm not suggesting anything she did was inappropriate. I don't know. I have no reason to believe it was. But was there any information in the records that -- what was she alleged to have spent money on?

MR. BARDO: Luxury hotels for migrants.

THE COURT: Luxury hotels for migrants?

MR. BARDO: There's nothing about that in the --

THE COURT: Is there anything about migrants or housing for migrants?

MR. BARDO: There is not, not in the Privacy Act.

THE COURT: Did she spend a lot of money on a television ad, for which she put on a lot of makeup and spent a lot of taxpayer money? Was she alleged to have done that?

MR. BARDO: Is Ms. Comans alleged to have done that?

THE COURT: Yeah.

MR. BARDO: No. Ms. Comans is not alleged to have done that.

THE COURT: So there's nothing in the record about her being responsible for housing migrant children or housing children or anything?

MR. BARDO: Nothing like that, Your Honor.

THE COURT: What was her job -- well, she was a CFO of

FEMA.

MR. BARDO: That's correct. And it's public record whether somebody is employed with the government, and we have case law, although it is from other district courts, saying that someone's employment status, even saying that this person was terminated, is not a violation of the Privacy Act.

THE COURT: Okay. One second.

(Off-the-record discussion.)

THE COURT: Slander is when you say something verbally, right, and libel is when you write it?

MR. BARDO: I believe that's correct, Your Honor, but we have not --

THE COURT: Is it the other way around?

MR. ZAID: The trick, slander/spoken.

THE COURT: Perfect. Thank you. I will never forgot that. Where did you go to law school?

MR. ZAID: Albany Law School.

THE COURT: See, they teach you something at Albany Law School.

She went to Yale Law School and she's useless. She's not useless. She's a phenomenal clerk.

MR. BARDO: There is no waiver of sovereign immunity for slander or libel. So the only way to bring any claim of that flavor would be through the Privacy Act. And that only allows you to bring claims stemming from information in a

system of records.

THE COURT: Could they sue the individual for slander or libel?

MR. BARDO: If they were to do that, we would -- I mean, it would be up to Mr. Fathenroth, (ph) but we would likely file a Westfall certification saying that she was acting within the scope of her employment and the United States is the proper defendant. Therefore --

THE COURT: Let's pretend the statement is totally false and made up. Putting out a statement that's slanderous, totally false and made up is within the scope of someone's employment?

MR. BARDO: I can't say a hypothetical.

THE COURT: I'm not going to put you on the spot. All right.

Can I see you again?

Look, I trust Mr. Bardo. And so if he's telling me that he looked for things and didn't find them, I believe him. I would not say that about every government attorney who appears before me, but I believe that about Mr. Bardo.

So I think he did what I asked him to do, and I can't give you the deposition of the woman because she's no longer with the government.

MR. ZAID: If I might?

THE COURT: Yeah.

MR. ZAID: The question that we did not have answered was whether or not there is a system of record that applies to the Office of Public Affairs in doing their work, when they create their emails, when they talked about particular employees, how does that correlate?

I totally agree, the records that we were given from the systems that we identified to Mr. Bardo do not say anything other than the termination. Though, I will reiterate, I think the status of someone's employment, do they work for the government, do they not, would likely be fair game.

Saying someone's been terminated, not necessarily fair game. I don't know of any -- I'd love to see the case law, and I'm not saying that there isn't any, but I don't think that usually that question per se has been decided, and that would be something that we could look at.

THE COURT: Because saying you've been -- how did she put it? That she was fired? What did the statement say?

MR. ZAID: There's a difference between --

THE COURT: This is an actual factual question. What does the statement say, that she was what?

MR. BARDO: It says that she was fired for circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants.

THE COURT: And the cases that you have, do they say that saying someone's fired would be a matter of public record?

MR. BARDO: Yes. That there's no functional difference between disclosing someone's employment status and disclosing whether someone has been terminated, because someone's employment status is public record.

MR. ZAID: I mean, I would be interested to see, not that I'm doubting, but there's always a distinction that could potentially be made.

THE COURT: You said it wasn't this district, but what district is it?

MR. BARDO: The main case is in the Eastern District of Washington.

THE COURT: What's the case cite?

MR. BARDO: That's Stewart versus Vilsack. I have the Westlaw cite. 2016 WL 6902347.

MR. ZAID: So that tells me a couple of things. That it's very unsettled law. The Privacy Act, the majority of the cases are decided out of our district, for obvious reasons. It's federal employees. And that it's an unreported case as well. Vilsack was the Secretary of Agriculture. Went to Albany Law School, by the way.

THE COURT: See. Smart people go to Albany Law School.

MR. ZAID: I've met the guy.

So I definitely think that would be an open question.

THE COURT: Why don't we do this.

MR. ZAID: If I could say, just so you understand, there's more than just the press release. There were other things. The Deep State, that wasn't in the press release. Those were -- I don't know if they were verbal or emailed. Those were comments she made to print media. I think it was *The New York Times*.

THE COURT: Okay. I mean, look, I understand the frustration. I understand why somebody would sue and want to sue. And I am beyond sympathetic to it. However, it does feel like we're trying to fit a slander case into a Privacy Act case.

Now, that said, here's what I think we should do. I think that you guys should brief two issues. One, does the fact of termination -- is the fact of termination, as opposed to working or not working, is that a Privacy Act violation, if that's disclosed. And does everyone understand what I mean by the difference between working and not working versus termination? Yes?

MR. ZAID: I think so, Your Honor.

MR. BARDO: I believe so.

THE COURT: In other words, I can see how something -- I can see how there's an on/off switch that would be public. You're either employed for the government or not. And it would be -- however, it would be different if the additional thing that you got out of the database was not just that the person

wasn't working but that they were terminated, right? So we're all agreed.

MR. ZAID: Normally, in fact, when we're dealing with personnel disputes with the agencies, one of the things we ask is what are you going to say if someone contacts you? And they would just say they worked from this date to this date.

THE COURT: Wonderful. Great. I just need that legal issue briefed.

And second, I guess this theory you have that -- I don't even think it's worth briefing the false information in the records theory because I don't think there was false information. My guess is that this person just made it up.

But if Mr. Bardo tells me that he looked at the database and you don't find it. But if you want to brief that in case you're right, I might order more discovery, you can brief that.

Here's what I don't want you guys to do. I don't want you guys spending a ton of time writing up a background section and the legal standards section and all the things. Just say, here are the two legal issues that the Court wanted briefed. Brief them, and then you can oppose. And then government, you can have a reply, and then we'll have a more fulsome hearing.

And I don't need a thousand pages. Just here are the main cases. All right?

MR. ZAID: Understood, Your Honor.

THE COURT: I'm doing this because I'm just trying to make your lives easier. And at the end of the day, all I'm going to do on these discrete legal issues is go to the cases myself. So I don't want you spending a bunch of time making it pretty. Does that all make sense?

MR. ZAID: Yes, Your Honor.

MR. BARDO: Yes.

THE COURT: If I find that this survives in some way, then we will take iterative discovery steps. Okay?

In the meantime, have you looked at whether or not DHS has a database that they use to pull information before they issue things?

MR. BARDO: I have, Your Honor. They say they do not -- or you mean for the Public Records Office or the Office of Public Affairs, specifically?

THE COURT: Yeah. Wherever this woman was.

MR. BARDO: Yes. I asked DHS if there's any system of records that the Public Records Office or Office of Public Affairs uses, and they said there is not.

THE COURT: Okay. Either someone told her -- my guess is someone sent her an email saying we fired this person, say something about it.

And I take it -- well, anyway, let's just figure out these legal issues first and then we'll go from there. Okay?

MR. ZAID: And I'm sorry, did you want simultaneous

filings or --

THE COURT: We can do it the same -- you guys figure it out. I really don't care. If you want simultaneous exchanges and re-exchanges, I don't care. Let's just get this done within the next 60 days or so, so that we can have another hearing.

It's now March 24th. April 24th. Let's just try to have another hearing before June. Okay? You guys just work out a schedule amongst yourselves. Work it out with Ms. White.

And again, I can't emphasize this enough. Please do not spend a ton of time on the briefing. Remind me what the -- maybe you guys can agree on the language of the two legal questions, whatever. Say this is what you wanted. Here are the cases. Here's why we think they're important. But mainly, here are the cases. Okay?

MR. ZAID: Understood.

MR. BARDO: Your Honor, do you want us to file a proposed briefing schedule?

THE COURT: Yeah, sure. But mainly, I want you to get a proposed briefing schedule together so you can reach out to Ms. White and get something on the calendar for a hearing. Okay?

MR. BARDO: Understood, Your Honor.

THE COURT: Mr. Bardo, thank you for doing that initial work.

MR. BARDO: Absolutely, Your Honor.

(Proceedings concluded at 4:26 PM)

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

/s/ Stacy Johns                Date: April 30, 2026

Stacy Johns, RPR, RCR
Official Court Reporter